IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

RACHEL RITKE and DORI HOUX,

                    Plaintiffs,                            7:22-CV-5002

vs.

                                                    MEMORANDUM AND ORDER
CRAIG SCHUESSLER, individually;
JIM BUSH, individually; and
JENNIFER BURGESS, individually;

                    Defendants.

        Rachel Ritke and her mother, Dori Houx, allege several different claims,
based in both federal and state law, arising from the execution of a search
warrant at their family residence and subsequent placement of Ritke, then a
minor, in temporary out-of-home custody. Specifically, Ritke asserts three
state law claims against Craig Schuessler regarding his conduct when she was
temporarily placed in his custody. This matter is before the Court on the
motion to dismiss (filing 21) filed by Schuessler, asserting that this Court lacks
jurisdiction over those state law claims against him. The Court disagrees and
will deny the defendant's motion to dismiss.


                                    BACKGROUND

        Ritke and Houx lived in Potter, Nebraska. Filing 5 at 1. On April 20,
2018, Ritke was involuntarily removed from her home following the execution
of a search warrant by Defendant Jim Bush, and placed into the custody of
Defendant Jim Schuessler by Defendant Jennifer Burgess, a case manager
with the Nebraska Department of Health and Human Services ("DHHS").
Filing 5 at 2-3. The claims brought against the Defendants arise from this

series of events. This case is still at the pleading stage, which means that, for now, the Court is required to assume that the plaintiffs' allegations are true.

Bush is a police officer employed by the Sidney, Nebraska Police Department. Filing 5 at 6. After reports of someone smoking marijuana at Ritke and Houx's residence, Bush and an investigator performed two trash pulls outside. Filing 5 at 7. They found packages from Colorado-based marijuana companies, but the packages tested negative for marijuana residue. Filing 5 at 7-8. Bush nonetheless applied for a search warrant from the District Court of Cheyenne County, and it was issued. Filing 5 at 8. Bush and a tactical team executed the search warrant in full tactical gear and woke up Ritke by yelling and pointing firearms in her direction. Filing 5 at 9. Houx was not home at the time of the search. Filing 5 at 8.

Houx was on her way home but when she saw the police cruisers, she left the area. Filing 5 at 9. Houx then went to Schuessler, her next-door neighbor, to borrow a phone to call Ritke. Ritke told Houx that police were searching the home for marijuana. Filing 5 at 9. Bush saw Ritke talking on her cellphone, and confiscated it. Filing 5 at 9. Houx was scared that she would be held in custody over the weekend if she could not produce bail money, so she went to Wyoming, then to Ritke's father's home in Colorado to collect bail money. Filing 5 at 9-10.

During the execution of the search warrant, Schuessler entered Houx's residence. Filing 5 at 10. Schuessler, who is not a law enforcement officer, spoke with Bush and took photos at the residence. Filing 5 at 10. Schuessler and Bush are allegedly long-time friends. Filing 5 at 24. The plaintiffs allege that Schuessler's presence served no legitimate law enforcement purpose, and that he was obviously intoxicated. Filing 5 at 10. Schuessler repeatedly told Bush that he could take custody of Ritke. Filing 5 at 10. Bush also asked

Schuessler to contact Skipp Batt, a friend of Houx and father figure to Ritke, to ask about Houx's location. Filing 5 at 10. During the call, Schuessler presented himself as acting on behalf of law enforcement. Filing 5 at 11. After the call, Schuessler returned to his home. Filing 5 at 10. Schuessler's daughter was friends with Ritke, and Bush later asked Schuessler to return to the residence with his daughter to help Ritke calm down. Filing 5 at 11. By late afternoon that day, the search warrants had been executed, and Bush drove Ritke to the Sidney Police Department. Filing 5 at 12.

Schuessler called Ritke's father, again presenting himself as acting on behalf of law enforcement, and told him that Ritke was in police custody. Filing 5 at 13. Bush began interrogating Ritke, but then Ritke's father called to demand that he stop. Filing 5 at 13. Bush said he was legally permitted to interrogate Ritke without a parent or guardian present. Filing 5 at 13. Bush also refused to release Ritke into her father's custody. Filing 5 at 13. Ultimately, Bush charged Houx with possession of marijuana weighing more than one pound, although Bush stated the search produced only "suspected hash/THC wax and half an ounce of marijuana." Filing 5 at 13, *see* Neb. Rev. Stat. § 28-416(12). Bush was aware at the time that Ritke had a medical condition and used marijuana to treat pain. Filing 5 at 21.

Bush swore an affidavit in support of removing Ritke from Houx's custody, including a statement that Houx was at a female neighbor's home during the execution of the search warrant. Filing 5 at 14. Yet, during subsequent investigation, Bush asked Schuessler's daughter about Houx's presence at their home during the execution of the search warrant. Filing 5 at 14. The county court granted an Application for Temporary Custody which placed Ritke into the custody of the DHHS. Filing 5 at 14-15.

Burgess, Ritke's case manager, was to place Ritke in a suitable residence. Filing 5 at 15. Bush then informed Burgess that Schuessler agreed to accept custody of Ritke earlier that day. Filing 5 at 15. At Bush's suggestion, Burgess transported Ritke to Schuessler's residence. Filing 5 at 15. Houx had previously told Ritke not to be alone with Schuessler, due to his alleged alcoholism and past sexual harassment toward Houx and other women in town. Filing 5 at 15. After Ritke spoke with Schuessler's daughter and learned that she wasn't home, Ritke asked Burgess not to place her in Schuessler's custody until Schuessler's daughter returned. Filing 5 at 15. Burgess allegedly admitted to Ritke that she was aware of Schuessler's alcohol abuse. Filing 5 at 16. But Burgess said that Ritke had to be placed at that time because it was too late to take her to a group foster home in Omaha. Filing 5 at 16.

According to the plaintiffs, when Ritke and Burgess arrived at Schuessler's residence, he was significantly and visibly intoxicated. Filing 5 at 16. Schuessler was unable to remember filling out the paperwork with Burgess, was unable to form coherent sentences when speaking with Burgess, and fell out of his chair while completing the paperwork. Filing 5 at 16. While speaking with Burgess, Schuessler repeatedly made lewd comments and said he would make Ritke his "cleaning bitch." Filing 5 at 16. Burgess later completed a Safety Assessment Report regarding her interactions with Schuessler, but nevertheless approved Ritke's placement with Schuessler. Filing 5 at 17.

After Burgess left Ritke alone with Schuessler, Schuessler sat in the living room with Ritke and began making lewd comments. Filing 5 at 17. Ritke ignored him, but Schuessler continued. Filing 5 at 17. Ritke then told him "No" and "Stop" which angered him. Filing 5 at 18. Ritke attempted to change the subject and talk to him about his daughters, but he continued making sexually

suggestive comments. Filing 5 at 18. Ritke asked Schuessler to call his daughter, and during the call Ritke begged his daughter to come home. Filing 5 at 18. Schuessler's daughter told Ritke she was 40 minutes away. Filing 5 at 18.

After the call, Schuessler continued making sexual remarks towards Ritke and then "shot up" from his recliner prompting Ritke to do so as well. Filing 5 at 18. Schuessler then grabbed Ritke's shoulders until she broke free and ran up to his daughter's bedroom where she shut and barricaded the door. Filing 5 at 19. Schuessler's daughter returned home 40 minutes later and left with Ritke. Filing 5 at 20.

The plaintiffs allege that Schuessler then began sending sexually explicit text messages to Burgess. Filing 5 at 20. Burgess was at the Sidney Police Department when she received the messages and decided it was necessary to remove Ritke from Schuessler's custody. Filing 5 at 20. Burgess learned that Ritke was no longer at the residence and called Schuessler's daughter to ask Ritke to return to Schuessler's residence. Filing 5 at 21. Upon her return, Burgess asked Ritke who she could stay with and, at Ritke's request, took her to Batt's residence, performed a Safety Assessment Report, and approved Ritke's placement with Batt. Filing 5 at 21. Batt later confirmed that Burgess informed him that Schuessler had sent her sexual text messages. Filing 5 at 21.One week later, Ritke was permitted to return to Houx's custody under DHHS supervision. Filing 5 at 21.

Following the events of April 20, 2018, Ritke alleges she began experiencing emotional distress. Filing 5 at 26. She ultimately failed 11th grade. Filing 5 at 4.

The complaint additionally suggests that efforts were made to conceal the events of April 20, 2018. Filing 5 at 22-26. Ritke reported the events,

including Schuessler's conduct, to the Cheyenne County Sheriff's office. Filing 5 at 22. Burgess was the only witness interviewed about the incident and no investigation was opened regarding her allegations. Filing 5 at 22. Further, Burgess documented her actions concerning Ritke's placement with Batt in significant detail, but her reports only contain a single sentence regarding Ritke's placement with Schuessler. Filing 5 at 23. According to the plaintiffs, at some point Burgess did provide this Safety Assessment Report to a Cheyenne County official, but it is unclear when this occurred or to whom it was given.

Nearly three years later, Ritke decided to file another report regarding Schuessler's conduct. Filing 5 at 24. Bush assigned himself to the investigation. Filing 5 at 24. Bush interviewed Ritke first and, during that interview, said he had thought Schuessler's daughters were at the residence when she got there. Filing 5 at 24. After that interview, Bush interviewed Schuessler's daughter and Burgess, and they also said Schuessler's daughters had been present when Ritke was left there and that Ritke hadn't been left alone. Filing 5 at 24. According to the plaintiffs, Schuessler's daughter and Burgess were lying, and the plaintiffs suggest it's suspicious that Bush apparently knew they would lie before they actually did. Filing 5 at 25. And according to Houx, shortly after the incident, Schuessler's daughter said that she was in Sidney when Ritke was at the residence. Filing 5 at 24.

When Bush interviewed Schuessler, he asked Schuessler direct questions without any follow up questions for six minutes and spent the remaining five minutes discussing personal matters. Filing 5 at 25. The Cheyenne Prosecutor's office declined to move forward. Filing 5 at 25.

Ritke and Houx then filed this case against Bush, Burgess, and Schuessler. The claims against Bush and Burgess are brought under 42 U.S.C.

6

§ 1983, and the claims against Schuessler are brought under Nebraska state law. Against Bush, Houx asserts a Fourth Amendment claim for an unlawful search. Filing 5 at 27. She claims it was unreasonable for Bush to allow Schuessler, who is not a member of law enforcement and whose presence served no legitimate purpose, to be present. Filing 5 at 28. Against Burgess, Ritke asserts a Fourteenth Amendment substantive due process claim. Filing 5 at 28. Ritke alleges that Burgess had a constitutional duty to provide for her safety and general well-being, including her basic right to be safe from harm in her custodial placement, and breached this duty when placing her in Schuessler's care after observing his severe intoxication, inability to sit in a chair, and sexually explicit conduct. Filing 5 at 31.

And against Schuessler, Ritke asserts claims of assault and battery, intentional infliction of emotional distress, and negligence. Filing 5 at 33-36. Ritke alleges that Schuessler's physical contact with her in his residence was unconsented to and unjustified. Filing 5 at 33. Ritke also alleges that Schuessler's continued sexual advances toward her, physical restraint, and general position of power over her caused her severe emotional distress. Filing 5 at 34-35. Ritke finally alleges that Schuessler's assumption of custody of her created affirmative duties of care and to not engage in injurious behaviors. Filing 5 at 35-36.

The Court has jurisdiction over the § 1983 claims against Bush and Burgess under 28 U.S.C. § 1331, but the question here is whether the Court has supplemental jurisdiction over the purely state law claims. Schuessler filed a motion under Federal Rule of Civil Procedure 12(b)(1) to dismiss the claims against him due to the Court's lack of subject-matter jurisdiction over the state law claims. Filing 21 at 1. Schuessler argues that the claims do not derive from a common nucleus of operative fact, and even if they did, the state law claims'

7

predomination over the federal claims and the risk of confusion in a single trial suggests the Court must decline to exercise supplemental jurisdiction. Filing 22 at 6.

## STANDARD OF REVIEW

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008).

A court deciding a Rule 12(b)(1) challenge must distinguish between a "facial attack"' and a "factual attack." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). In a facial attack, the Court merely needs to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* Accordingly, the Court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)—that is, the Court accepts all factual allegations in the pleadings as true and views them in the light most favorable to the nonmoving party. *Id.*; *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008). Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, may be considered. *Branson Label*, 793 F.3d at 914.

Schuessler challenges Ritke's alleged basis for the Court's supplemental jurisdiction over the state law claims, without presenting any additional evidence outside the pleadings. Thus, Schuessler poses a facial challenge to the

Court's subject-matter jurisdiction over those claims, and the Court will restrict itself to the face of the pleadings.

DISCUSSION

Under 42 U.S.C. § 1983, citizens of the United States can bring civil actions for violations by state actors of their rights, privileges, or immunities secured by the Constitution. 28 U.S.C. § 1331 confers subject-matter jurisdiction in district court over constitutional claims arising from § 1983.

When purely state law claims are raised concurrently with federal question claims, the court must find supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims. The Court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Id*. But the Court has discretion to decline supplemental jurisdiction when

> (1) the claim raises a novel or complex issue of state law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

§ 1367(c).

The Court's jurisdiction over the § 1983 claims against Bush and Burgess is undisputed. Schuessler challenges the Court's jurisdiction over the state law claims against him. Schuessler argues that the Court should decline to exercise jurisdiction over the claims by Ritke against him because there is no common

9

nucleus of operative fact. § 1367(a). He further contends that even if a common nucleus of facts was established, the Court should decline to exercise supplemental jurisdiction because the state law claims against him substantially predominate over the § 1983 claims and for other compelling reasons. § 1367(c)(2), § 1367(c)(4). The Court is not persuaded.

COMMON NUCLEUS OF OPERATIVE FACTS

State and federal claims "form part of the same case or controversy" as to confer supplemental jurisdiction over the state law claim when they "derive from a common nucleus of operative fact." § 1367(a), *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966). And the Court must exercise supplemental jurisdiction over such claims absent one of the four exceptions outlined in § 1367(c). *S. Council of Indus. Workers v. Ford,* 83 F.3d 966, 969 (8th Cir. 1996), *McLaurin v. Prater,* 30 F.3d 982, 985 (8th Cir. 1994).

If the claims considered "without regard to their federal or state character" are so related that they would ordinarily be tried in one proceeding, then a federal court should hear the whole. *Gibbs,* 383 U.S. at 725. Two claims are so closely related as to derive from a common nucleus fact when "the scope of issues presented, the damages alleged, and the evidence required" for both claims are essentially the same. *McNerny v. Neb. Pub. Power Dist.,* 309 F. Supp. 2d 1109, 1118 (D. Neb. 2004).

In this case, the federal and state claims all derive from a single day of events. Schuessler argues that an unreasonable search is in no way related to the facts that will govern the state law claims against him. Filing 22 at 4. He also argues that Burgess' violation of Ritke's rights is "entirely independent of [his] alleged wrongs." Filing 26 at 2. But Schuessler's presence at the execution of the search warrant is the basis for the unreasonable search claim, and Schuessler's actions during Burgess' placement of Ritke in his home are the

10

basis for the substantive due process violation. Further, his alleged friendship with Bush and their conversation during the execution of the search warrant led to the placement of Ritke in his home, and the interaction between Schuessler and Burgess is the circumstance that allows the state law claims against him to arise, particularly the negligence claim. There's much more than just a temporal connection between events, as Schuessler suggests. The actions of Bush, Burgess, and Schuessler allegedly facilitated each other's actions and should logically be tried in one proceeding without consideration of their federal or state character. *See Gibbs*, 383 U.S. at 725.

The state law claims and federal law claims present issues all within the same scope of events that will require extensive overlapping evidence. Additionally, the damages alleged for the state law claims are all included in the damages alleged in the claim against Burgess. Ritke should not be forced to sue in two different courts when the evidence presented and witnesses called at both trials would significantly overlap. "[J]udicial economy and preservation of resources weigh against such duplicative litigation." *Karstens v. Int'l Gamco, Inc.*, 939 F. Supp. 1430, 1441 (D. Neb. 1996). Because the scope of the claims and evidence required are essentially the same, the claims derive from a common nucleus of operative fact. The Court is, absent an exception, required to exercise supplemental jurisdiction over the state law claims.

DISCRETION TO DECLINE JURISDICTION

However, even if state and federal law claims derive from a common nucleus of operative fact, a court can use its discretion to decline supplemental jurisdiction if one of the four conditions enumerated in § 1367(c) exist. But the existence of one of the four exceptions in subsection (c) does not obligate dismissal. The decision to exercise supplemental jurisdiction considers a range

of values including judicial economy, convenience, and fairness. *Gibbs,* 383 U.S. at 726.

Schuessler relies on two of the four enumerated exceptions to exercising supplemental jurisdiction in his argument for dismissal. He argues that (1) the state law claims substantially predominate over the federal law claims; and (2) there are exceptional circumstances and other compelling reasons to decline supplemental jurisdiction. § 1367(c)(2), (3).

First, a court can use its discretion to decline to exercise supplemental jurisdiction when the state law claims substantially predominate the original jurisdiction claims. § 1367(c)(2). A claim could predominate in "terms of proof, of scope of issues raised, or of comprehensiveness of remedy sought." *Gibbs,* 383 U.S. at 726. A state law predominates when it "constitutes the real body of a case, to which the federal claim is only an appendage." *Id.* at 727.

Schuessler argues that the § 1983 claims arise from the state law claims, and "[j]urisdiction should be declined when any basis for supplemental jurisdiction provides the basis, ab initio, for a federal claim." Filing 26 at 3. But he doesn't provide any legal authority for this argument, and it's unfounded in any jurisdictional doctrine. The exercise of supplemental jurisdiction over the state law claims against him does not create the original jurisdiction over the constitutional claims—rather, as explained above, *both* the federal and state claims arise from a common sequence of events.

Correspondingly, Schuessler has not alleged any variances in proof, expansion in scope, or more comprehensive remedies sought by the state law claims that would diminish the federal claims to mere appendages of the case. *Gibbs,* 383 U.S. at 726. Indeed, the state law claims do not present any vastly more complex issues or unduly broaden the scope of the federal claims as to substantially affect the dynamics of the litigation. *See Cortez v. Neb. Beef, Inc.,*

12

266 F.R.D. 275, 286 (D. Neb. 2010), *Karstens*, 939 F. Supp. at 1441. It is unlikely, for state law claims based on the same factual allegations that seek the same remedy to substantially predominate federal claims, and they don't in this case. *See Gibbs*, 383 U.S. at 726. Because the state law claims do not substantially predominate as to make the federal law claims mere appendages of the case, the Court will not decline supplemental jurisdiction for this reason.

Second, a court can also use its discretion to decline to exercise supplemental jurisdiction in "exceptional circumstances" for other "compelling reasons." § 1367(c)(4). But the language of the statute suggests that declining jurisdiction through subsection (c)(4) "should be the exception, rather than the rule." *Exec. Software N. Am., Inc. v. U.S. Dist. Ct. for Cen. Dist. of Cal.*, 24 F.3d 1545, 1558 (9th Cir. 1994). Identification of "exceptional circumstances" and "compelling reasons" requires consideration of the values of judicial economy, convenience, and fairness. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Schuessler argues that the possibility of jury confusion and inconsistent verdicts are exceptional circumstances and compelling reasons to decline to exercise supplemental jurisdiction. Filing 22 at 5. But the chance that juries must analyze and consider multiple different legal theories is far from exceptional, as is the potential for different outcomes amongst claims. Neither of these considerations "create a sufficient likelihood of jury confusion to justify dismissing" the state law claims, particularly with the same factual allegations forming the basis of the claims. *Karstens*, 939 F. Supp. at 1441. In fact, the most obvious way to avoid inconsistent jury verdicts would be to try the cases together and appropriately instruct the jury on the measure of the plaintiffs' alleged damages.

Schuessler additionally suggests that his actions are so independent from the other claims that it would be unfair to exercise jurisdiction over the claims against him alongside the federal law claims. The Court is not persuaded that the mere presence of alternative claims against other defendants will create such an undue, additional burden on Schuessler as to warrant declining to exercise supplemental jurisdiction. Particularly, it does not outweigh the judicial economy and convenience accommodated in trying factually related claims together.

CONCLUSION

For the reasons explained above, the Court will exercise supplemental jurisdiction over the state law claims against Schuessler. The state law claims arise from the same series of events as and are so interrelated with the federal law claims as to form the same case or controversy. 28 U.S.C. § 1367(a) mandates exercising supplemental jurisdiction over the related claims, and the factors in 28 U.S.C. § 1367(c) do not justify dismissing the claims.

IT IS ORDERED that Schuessler's motion to dismiss (filing 21) is denied.

Dated this 21st day of June, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge

14